C. Robert Steringer (OSB #983514)
  bob.steringer@harrang.com
HARRANG LONG P.C.
111 SW Columbia St., Suite 950
Portland, OR 97201-5841
(503) 242-0000

*Lead Counsel for Plaintiff Grand River*
  *Enterprises Six Nations, Ltd.*

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# EUGENE DIVISION

| | |
|---|---|
| GRAND RIVER ENTERPRISES SIX NATIONS, LTD., | Case No.: 6:24-cv-519 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| | 42 U.S.C. § 1983; Violations of Due Process Clause; Violations of Commerce Clause |
| ELLEN F. ROSENBLUM, in her official capacity as Attorney General of the State of Oregon, | |
| Defendant. | |

Grand River Enterprises Six Nations, Ltd., by and through its counsel, upon personal knowledge of its own actions and public materials, and upon information and belief as to all other matters, complains against Defendant Ellen F. Rosenblum, in her official capacity as Attorney General of the State of Oregon, as follows:

Complaint — Page 1

## INTRODUCTION

1.      This case implicates two fundamental limits on state power.

2.      The first is a limit on States' authority to regulate conduct and impose assessments on parties outside their borders.  That limit derives from both the Commerce Clause, which prohibits a State from regulating commercial activity in other States and outside the United States, and the Due Process Clause of the Fourteenth Amendment, which prevents a State from applying its laws to those with no in-state connections.

3.      The second is a limit on States' power to impose liability on private parties for past misconduct without due process—or, as here, without any process whatsoever.  Under longstanding precedent applying the Due Process Clause, a State can *never* exact a financial penalty without first affording notice and a hearing.  And when that penalty relies on a determination of liability under state tort law, due process demands specific protections: the right to present evidence, the right to a neutral decisionmaker, and the right to judicial review.

4.      The Oregon statute at issue here, House Bill 2128 ("H.B. 2128"), runs roughshod over these limits on state power—and thus over the rights those limits protect.

5.      In 1998, the State of Oregon settled a lawsuit brought against the largest tobacco manufacturers in the country.  Those manufacturers were accused of lying to regulators and the public for decades, as well as denying—and burying evidence of—the addictiveness and health risks of cigarettes.  Under the settlement, those manufacturers agreed to make annual payments to Oregon (and other settling States) in perpetuity.  The settlement gave other manufacturers— who had not been sued—an option to settle potential future claims against them by making annual payments in perpetuity as well.

6.      Plaintiff Grand River Enterprises Six Nations, Ltd. ("Grand River Enterprises"), is a Canadian tobacco manufacturer that does not do any business in the United States.  Grand River Enterprises was not a part of the 1998 settlement and has chosen not to join the settlement. Grand River Enterprises did not engage in the misconduct that led to the lawsuit against other tobacco manufacturers, and neither Oregon nor any other State has asserted claims against Grand River Enterprises akin to those settled with other manufacturers in 1998.

7.      Nevertheless, H.B. 2128 requires Grand River Enterprises to make annual payments to Oregon—payments that are designed to essentially equal the amount Grand River Enterprises would pay if it instead joined the settlement.  In other words, the State of Oregon— acting through a vote of the Legislative Assembly and a stroke of the Governor's pen—has reproduced the result of a lawsuit *without ever actually needing to bring the lawsuit*.  And what is more, it has done so against a foreign corporation doing no business in the State, based solely on the fact that third-party importers and downstream distributors have caused Grand River Enterprises' cigarettes to be sold in Oregon.

8.      At the outset, H.B. 2128 is invalid as applied to Grand River Enterprises under both the Commerce Clause and the Due Process Clause because Grand River Enterprises conducts all of its business outside the United States and has no contacts with Oregon sufficient to justify Oregon's imposition of assessments.  The Commerce Clause precludes Oregon's effort to apply its law to commercial conduct and transactions occurring entirely outside the State, and the Due Process Clause precludes Oregon's effort to apply its law to out-of-state entities with no Oregon contacts, regardless of the nature of the regulated conduct.

9.      In addition, even setting aside the extraterritoriality concerns, H.B. 2128's imposition of liability on non-settling tobacco manufacturers is flatly unconstitutional.  Indeed,

its scheme—forced settlement by legislation, rather than through voluntary negotiation or a litigated judgment imposed by courts—would seem to obviate the need for a State to ever invoke its judicial system to get relief from private parties alleged to have caused harm to the State and its citizens.  There is a good reason we do not often see States attempt such a gambit: it violates the most basic tenets of due process.

10.    Oregon and other States sued tobacco manufacturers for misconduct, and the parties negotiated a settlement of the claims.  It is fundamentally unfair for Oregon to now force that settlement on other manufacturers who have not been sued, who have not chosen to settle, and who are not liable to the State.  Oregon's law implies that, in Oregon's view, the entire settlement process with the original manufacturers was pointless, as Oregon and other States could just as well have unilaterally imposed the terms of the settlement on those manufacturers (or terms even more favorable to the States).

11.    Grand River Enterprises has the right not to settle hypothetical and baseless claims against it.  This Court should declare that H.B. 2128's attempt to circumvent that right is foreclosed by the Due Process Clause.

## PARTIES

12.    Plaintiff is Grand River Enterprises Six Nations, Ltd., a Canadian corporation with its principal place of business in Ohsweken, Ontario, Canada.  Grand River Enterprises is a manufacturer of tobacco products operating exclusively on the Six Nations of the Grand River Indian Reserve in Ontario, Canada.

13.    Defendant is Ellen F. Rosenblum, who has served as Attorney General of Oregon since 2012.  The Attorney General of Oregon has authority to enforce the provisions of H.B. 2128; Ms. Rosenblum is accordingly named in her official capacity.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the United States Constitution.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this district and because a substantial part of the events giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

### I.     The MSA

16.     In 1998, the State of Oregon and 45 other States (as well as six territories) settled claims they had brought against the four major U.S. tobacco manufacturers—Brown & Williamson Tobacco Corporation, Lorillard Tobacco Company, Philip Morris Inc., and R.J. Reynolds Tobacco Company.  The States had sued those manufacturers for engaging in a decades-long scheme of obfuscation as to the health risks of smoking and manipulative advertising targeted at children.  The result was the largest settlement of civil litigation in U.S. history—resulting in payments of hundreds of billions of dollars to the States, including 10-digit annual payments in perpetuity, and a broad agreement by the manufacturers to forgo certain political activity and marketing strategies.  That settlement agreement is known as the "Master Settlement Agreement," or "MSA."

17.     The MSA extinguished the settling States' past claims and certain future claims against "participating manufacturers," or "PMs."  The four tobacco-manufacturer defendants who had been sued are known as the "original participating manufacturers," or "OPMs."  The MSA also provided that other tobacco manufacturers could join the agreement, similarly settling (as-yet unasserted) claims with the States, agreeing to make payments in perpetuity, and giving

up political and advertising rights. In the jargon of the MSA, other manufacturers joining the agreement are known as "subsequent participating manufacturers," or "SPMs."

18.     Though manufacturers can become SPMs at any time, the MSA encouraged participation by imposing lower payments on SPMs who joined immediately. MSA payments are generally tied to a manufacturer's U.S. market share, but if an SPM joined the settlement within 90 days of its execution, the MSA's grandfather clause would exempt it from payments corresponding to the greater of its 1998 market share or 125% of its 1997 market share. As a result, the MSA payments for SPMs who joined the MSA immediately are steeply discounted—if not zeroed out altogether.

19.      Over the last 25 years, scores of tobacco manufacturers other than the original four defendants have joined the MSA as SPMs, though only a few who do not benefit from the grandfather clause described above have survived. Some manufacturers, however, have opted not to become SPMs.

20.     Under the MSA, the OPMs make annual payments to the settling States, the sum of which is calculated by applying a series of adjustments to a base amount (which, for every year beginning in 2018, is $9 billion). Each OPM owes a share of that payment corresponding to its current national market share. SPMs' annual payments (before grandfather-clause adjustments) are calculated according to a formula intended to result in SPMs' per-cigarette payments approximating OPMs' per-cigarette payments.

21.     During the MSA negotiations, the OPMs expressed concern that the settlement would cause their costs to rise and thus open the door to price competition from manufacturers that did not join the MSA ("nonparticipating manufacturers," or "NPMs"). To address that possibility, the MSA included an "NPM Adjustment," which would reduce the base annual

payment by OPMs (and accordingly reduce SPMs' annual payments) based on the amount of market share lost to NPMs.

22. The MSA also provided that the NPM Adjustment—which operated to reduce payments to States—would not apply to States that enacted and diligently enforced "escrow statutes." The MSA included a model escrow statute, which would require NPMs to place a sum of money annually into escrow, paid on a per-cigarette-sold basis and roughly equivalent to the amount the NPM would owe the State for the sale of those cigarettes if the NPM were an SPM under the MSA (without an exemption). An NPM's escrow deposits would be held to fund potential liability in the event the State opted to sue the NPM, and the escrowed funds would revert to the NPM after 25 years if not used to fund a settlement or a judgment obtained by the State.

23. Each settling State, including Oregon, subsequently enacted an escrow statute.

24. Grand River Enterprises was founded in 1994. It has never engaged in the misconduct that was the subject of the claims settled under the MSA.

25. Grand River Enterprises has opted not to join the MSA and settle potential future claims against it, as it believes it has no liability to any State of the sort that gave rise to the MSA. Grand River Enterprises is therefore an NPM.

26. Neither Oregon nor any other State has brought claims against NPMs akin to those settled with PMs through the MSA.

## II.    Oregon's Escrow Statute

27.    Oregon enacted Senate Bill 792 ("S.B. 792"), its escrow statute, in 1999.  Act of June 16, 1999, ch. 272, 1999 Or. Laws 635 (codified as amended at Or. Rev. Stat. §§ 323.800, .803, .806 (2021 ed.)).[1]

28.    S.B. 792 declared it to be "the policy of the State of Oregon" that cigarette manufacturers should be responsible for the health costs smoking imposes on the State, but only "to the extent that such manufacturers either determine to enter into a settlement with the State of Oregon or are found culpable by the courts."  Or. Rev. Stat. § 323.803(4) (2021 ed.).

29.    S.B. 792 further declared the policy concern that "those tobacco product manufacturers who determine not to enter into such a settlement [*i.e.*, NPMs] could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that this state will have an eventual source of recovery from them *if they are proven to have acted culpably*."  Or. Rev. Stat. § 323.803(6) (2021 ed.) (emphasis added).

30.    To those ends, S.B. 792 required all NPMs selling cigarettes in Oregon either to become SPMs (*i.e.*, by settling as-yet-nonexistent smoking-related claims against them and becoming parties to the MSA) or to annually place a sum of money, calculated on a per-cigarette-sold basis, into escrow.  Or. Rev. Stat. § 323.806(1)(a), (b)(A) (2021 ed.).[2]

31.    S.B. 792 required NPMs to hold funds in escrow for 25 years, authorizing release before then only for the purposes of "pay[ing] a judgment or settlement on any [specified claim

---

[1]  Versions of Oregon's escrow statute prior to H.B. 2128's enactment are cited by reference to the 2021 edition of the Oregon Revised Statutes.  Citations to the Oregon Revised Statutes without an indication of the year are to the current version, as amended by H.B. 2128.

[2]  The escrow amount was set at approximately $0.009 per cigarette for 1999 sales, increasing to approximately $0.019 per cigarette by 2007, along with adjustments for inflation.  Or. Rev. Stat. § 323.806(1)(b)(A) (2021 ed.).  This increase tracks increases to OPM payments under the MSA.

defined in the MSA] brought against [an NPM] by the State of Oregon" (or certain other Oregon-based parties). Or. Rev. Stat. § 323.806(1)(b)(B)(i) (2021 ed.); *see id.* § 323.806(1)(b)(B)(iii).[3] Interest on an NPM's escrowed funds is paid as earned to the depositing NPM. *Id.* § 323.806(1)(b)(B).

32.    In 2011, Grand River Enterprises entered into a settlement with Oregon with respect to default judgments Oregon had obtained for outstanding escrow payments required by S.B. 792. Under the settlement agreement, Grand River Enterprises agreed to make a substantial escrow payment for the years in question and to continue making ongoing escrow payments. Grand River Enterprises also agreed to dismiss Oregon from an ongoing lawsuit challenging the escrow-payment scheme.

33.    In 2024—*i.e.*, 25 years after the 1999 enactment of Oregon's escrow statute— Oregon must begin releasing escrowed funds back to NPMs.

34.    As of the end of 2023, there were at most nine NPMs whose cigarettes were authorized to be sold in Oregon.[4] The identity of those NPMs is known to Oregon, as cigarette manufacturers' brands must be registered with the State before they can be sold there.

## III.    H.B. 2128

35.    On July 27, 2023, the Oregon Legislative Assembly passed, and Governor Kotek signed, House Bill 2128 ("H.B. 2128"), 2023 Or. Laws ch. 401. H.B. 2128 eliminated escrow

---

[3]  S.B. 792 also allowed release of funds in the event that an NPM had placed more into escrow than the amount it would have been required to pay under the MSA. *See* Or. Rev. Stat. § 323.806(1)(b)(B)(ii) (2021 ed.); *see also* Act of Sept. 24, 2003, ch. 801, § 22, § 293.535(2)(b)(B), 2003 Or. Laws 3293, 3305–06 (revising formula for release of excess payments).

[4]  *See* Or. Dep't of Just., Alphabetical Brand List (updated Jan. 2, 2024), https://www.doj.state.or.us/wp-content/uploads/2022/12/branddirectory.pdf.

payments as of 2024 and instead required NPMs, going forward, to make nonrefundable payments, called "equity assessments," directly to the State.

36.     Departing from the views of the Legislative Assembly that enacted S.B. 792, H.B. 2128 declared it to be Oregon's policy that tobacco manufacturers should be required to pay for the State's smoking-related financial burdens regardless of whether they have settled claims with the State or been found culpable in a court.  Or. Rev. Stat. § 323.803(4), (6).

37.     H.B. 2128 requires NPMs to make equity-assessment payments to Oregon for all cigarettes sold within the State from 2024 onward.  Or. Rev. Stat. § 323.804(1).  The required payment is $0.018842 per cigarette, adjusted for inflation.  *Id.* § 323.804(2).

38.     Unlike the former escrow payments, the equity assessments required under H.B. 2128 never revert to NPMs—they are deemed "the property of the state."  Or. Rev. Stat. § 323.804(3)(c).  Equity-assessment payments, however, "shall be credited on a dollar-for-dollar basis against any . . . judgment or settlement" if the State chooses to bring a claim against an NPM.  *Id.* § 323.804(3)(d)(A).

39.     H.B. 2128 imposes equity assessments on NPMs regardless of their ties to Oregon.  Even if an NPM operates entirely outside of Oregon and its cigarettes are sold within Oregon only by a third-party wholesaler, H.B. 2128 imposes liability on the out-of-state NPM. And in the case of foreign NPMs, the third party importing the NPM's products into the United States is jointly and severally liable with the NPM.  Or. Rev. Stat. § 323.804(6)(a).

40.     H.B. 2128 requires NPMs located outside the United States to submit to the Attorney General "a declaration from each importer that imports the cigarettes of the [NPM] intended for sale in [Oregon] stating that the importer accepts liability [for equity-assessment

payments] and consents to the jurisdiction of the courts of [Oregon] for the purposes of enforcing" that liability.  Or. Rev. Stat. § 323.804(6)(d).

41.     Though H.B. 2128 purports to put PMs and NPMs on equal footing, in reality it places NPMs in a far worse position.  This is so due to four features of the MSA and Oregon's implementing legislation.

42.     *First*, H.B. 2128 requires an NPM to post a bond for equity-assessment payments in advance of each quarter of each year or else have its brands removed from the State's tobacco directory.  Or. Rev. Stat. § 180.416(1)–(2).  The bond is the greater of $25,000 or the greatest equity-assessment (or escrow) payment made by the NPM during the prior three years.  *Id.* § 180.416(2).  Thus, even if NPMs' equity-assessment payments were equivalent to PMs' MSA payments, NPMs would end up paying more because of the need to fund bonds, which PMs have no obligation to do.

43.     *Second*, as noted above, the MSA's grandfather clause greatly reduces the MSA payments for those SPMs who joined quickly.  For instance, Liggett—the fourth largest tobacco manufacturer in the United States—had over 35% of its national sales ignored for MSA purposes in 2023 because of its status as an early joining SPM.[5]  This puts NPMs at an additional competitive disadvantage, as many PMs actually pay far less under the MSA than they would pay in equity assessments under Oregon's scheme.

44.     *Third*, PMs benefit from the NPM Adjustment discussed above, further lowering their MSA payments.  Even though each settling State enacted an escrow statute to avoid the

---

[5]  "Liggett . . . is not required to make any payments unless its market share exceeds its grandfathered market share established under the MSA of approximately 1.65% of the U.S. cigarette market.  . . .  We believe our tobacco subsidiaries have gained a sustainable cost advantage over their competitors because of the settlement."  Vector Grp. Ltd., Annual Report (Form 10-K), item 1, at 4 (Feb. 16, 2024).

NPM Adjustment, PMs have successfully argued in arbitration that they are entitled to the discount nonetheless because of the States' failure to diligently enforce the escrow statutes.

45.    *Fourth*, PMs' payments under the MSA completely resolve any potential liability they could have for smoking-related claims brought by States in the future.  By contrast, NPMs' equity-assessment payments only extinguish future liability to the extent of payments actually remitted.  In other words, if a PM paid $100,000 under the MSA, that payment would go toward extinguishing a potentially infinite amount of liability, whereas an NPM's same $100,000 payment would extinguish only $100,000 in potential liability.

46.    All told, PMs receive significant discounts on their putative MSA payments, and H.B. 2128 does not account for these adjustments.  In attempting to peg NPMs' payments to what they would owe under the MSA, Oregon in fact charges NPMs significantly *more* than they would pay if they were to join the MSA.

47.    The Attorney General of Oregon has authority to enforce H.B. 2128.  *Inter alia*, H.B. 2128 authorizes the Attorney General to bring civil suit on behalf of the State against any NPM that fails to timely remit the required equity assessment.  In such a suit, H.B. 2128 provides that the Attorney General is entitled to recover attorney fees, costs, and expenses.

48.    Grand River Enterprises will be required to deposit its first equity assessment with Oregon by April 15, 2024, pursuant to a statutory provision entitling the Attorney General to require equity-assessment payments in quarterly installments.  *See* Or. Rev. Stat. § 180.445(1).  The required payment in April 2024 will be $0.018842 per cigarette sold in the State between January 1, 2024, and March 31, 2024, with the amount to be adjusted for inflation.  H.B. 2128 also requires a bond to be posted in advance of each quarter to cover future equity assessments.  Accordingly, Grand River Enterprises is currently regulated by H.B. 2128.

**IV.     Grand River Enterprises' Oregon Connections**

49.     Grand River Enterprises manufacturers all its products in Ontario, Canada.

50.     Grand River Enterprises sells all its products in Canada to third-party importers.

51.     Grand River Enterprises has no physical presence in Oregon.

52.     Grand River Enterprises does not advertise in Oregon.

53.     Grand River Enterprises does not make any cigarette sales into Oregon.

54.     Grand River Enterprises has never made any false or deceptive claims regarding cigarettes or smoking.

55.     Grand River Enterprises does not direct that its products be sold in Oregon. Whether or not Grand River Enterprises' cigarettes are sold in Oregon is a function of the independent decisionmaking and conduct of third parties.

## <u>COUNT 1</u>
**(42 U.S.C. § 1983—Violation of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3)**

56.     Paragraphs 1 through 55 of this Complaint are repeated and realleged as if fully set forth herein.

57.     The Commerce Clause of Article I, Section 8, of the U.S. Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations . . . and among the several States." U.S. Const. art. I, § 8, cl. 3.

58.     The Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 614 (9th Cir. 2018) (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)).

59.     As applied to Grand River Enterprises, H.B. 2128 imposes an assessment on, and thus directly regulates, conduct and transactions that occur wholly outside of Oregon. Grand

River Enterprises does not do business in Oregon, either directly or through an agent or subsidiary. Yet H.B. 2128 imposes liability for equity-assessment payments on Grand River Enterprises on the basis of its foreign sales of products that are sold downstream in Oregon by independent third parties.

60.    Though Grand River Enterprises' products are sold in Oregon, those sales result from the independent decisions and actions of wholesalers or distributors that purchase from importers who in turn purchase from Grand River Enterprises in Canada.

61.    The independent decision of a third party to sell Grand River Enterprises' products in Oregon is an insufficient basis under the Commerce Clause for Oregon's imposition of an assessment on Grand River Enterprises, a foreign entity, for its out-of-state conduct and transactions.

62.    H.B. 2128 imposes liability on Grand River Enterprises based on its wholly out-of-state activities and the downstream sale by others of Grand River Enterprises' products in Oregon. Application of H.B. 2128 to Grand River Enterprises therefore violates the Commerce Clause.

### <u>COUNT 2</u>
**(42 U.S.C. § 1983—Violation of the Due Process Clause
of Section 1 of the Fourteenth Amendment)**

63.    Paragraphs 1 through 55 of this Complaint are repeated and realleged as if fully set forth herein.

64.    The Due Process Clause of Section 1 of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

65.     The Due Process Clause prohibits a State from subjecting an out-of-state entity to its laws in the absence of "significant contact[s]" between the entity and the State. *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308 (1981) (plurality opinion).  A State exceeds its legislative jurisdiction, and thereby violates due process, when it imposes financial assessments on businesses without sufficient in-state contacts.

66.     Grand River Enterprises does not have the requisite level of contacts that would support Oregon's legislative jurisdiction to impose the assessments at issue.  Grand River Enterprises does not do business in Oregon, either directly or through an agent or subsidiary, and Grand River Enterprises has no physical presence in Oregon.

67.     Though Grand River Enterprises' products are sold in Oregon, those sales result from the independent decisions and actions of wholesalers or distributors that purchase from importers who in turn purchase from Grand River Enterprises in Canada.

68.     Any purported effects that Grand River Enterprises' products have had on Oregon residents is an insufficient basis for subjecting Grand River Enterprises to Oregon's assessment scheme under the Due Process Clause.  And even if the Due Process Clause did allow a State to exercise legislative jurisdiction over foreign corporations based on in-state effects, no such effects have been shown here.  A State may not simply declare by legislative fiat that a foreign corporation's out-of-state activities have injured the State and thereby bring the foreign corporation within the ambit of the State's legislative jurisdiction.

69.     A State's ability to regulate out-of-state entities also turns on the nature of the regulation.  Here, the level of regulation is extreme.  Whereas the prior escrow scheme simply required Grand River Enterprises to deposit funds in Oregon to fund hypothetical future judgments or settlements, H.B. 2128 requires Grand River Enterprises to make payments directly

to the State on the basis of legislative findings that Grand River Enterprises is responsible for smoking-related harms in the State.

70.     H.B. 2128 imposes liability on Grand River Enterprises based on its wholly out-of-state activities and the downstream sale by others of Grand River Enterprises' products in Oregon.  These are constitutionally insufficient bases for applying Oregon law to a foreign entity.  Application of H.B. 2128 to Grand River Enterprises therefore violates due process.

### **COUNT 3**
**(42 U.S.C. § 1983—Violation of the Due Process Clause
of Section 1 of the Fourteenth Amendment)**

71.     Paragraphs 1 through 55 of this Complaint are repeated and realleged as if fully set forth herein.

72.     The Due Process Clause of Section 1 of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

73.     Even when a State has jurisdiction to apply its law, the Due Process Clause provides protections as to the manner in which a person can be deprived of life, liberty, or property.

74.     A party's rights under the Due Process Clause are at their apex when it is deprived of life, liberty, or property through an adjudication—*i.e.*, a state action that targets a small number of individuals or entities for deprivation of a protected interest.  A State may not act to deprive a small, targeted number of individuals of a protected interest without first providing sufficient process.  At a minimum, due process requires notice and the right to a hearing.

75.     A State cannot deprive a party of life, liberty, or property without satisfying the requirements of the Due Process Clause simply by effecting the deprivation through its legislature or by "giving [its] actions a legislative moniker."  *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 969 (9th Cir. 2003).  Rather, it has long been established that the Due Process Clause affords the right to a hearing when state action deprives a relatively small and specific number of individuals of property on an individually targeted basis.  *See, e.g.*, *Londoner v. City & County of Denver*, 210 U.S. 373, 385–86 (1908).  The ordinary legislative process does not satisfy the Due Process Clause in such a case.

76.     Further, some forms of deprivation may not be effected through a state legislature at all.  Before a party can be assessed damages for violations of the law, due process requires that its liability be adjudicated through an adjudicatory proceeding with specific safeguards— including the right to present evidence and argument before a neutral decisionmaker as well as the right to judicial review.

77.     H.B. 2128 deprives Grand River Enterprises of property by requiring the payment of equity assessments.

78.     H.B. 2128 effects no material change to Oregon law other than its imposition of equity assessments on Grand River Enterprises and other NPMs.

79.     Though the deprivation of property at issue here was effected through an act of the Oregon Legislative Assembly, the character of H.B. 2128—which is what is relevant for purposes of the Federal Constitution—is of an adjudication of liability against Grand River Enterprises and other NPMs.

80.     H.B. 2128 changes the law only as to the few NPMs whose cigarettes are sold in Oregon.  H.B. 2128 is thus targeted toward a small number of individual companies, and

therefore more process is due than that which exists through the ordinary legislative process. The failure to give Grand River Enterprises *any process whatsoever* before enacting a law that targets it on an individual basis violated the Due Process Clause.

81.    H.B. 2128 further violates due process by adjudicating Grand River Enterprises' liability without any of the safeguards required in adjudicative proceedings.  In effect, H.B. 2128 enters a final judgment against Grand River Enterprises, deeming it liable for causing smoking-related harms to citizens of Oregon.  This final judgment was entered without any opportunity for Grand River Enterprises to submit evidence or argument, without any neutral decisionmaker, and without any form of judicial review.  In enacting H.B. 2128, the Oregon Legislative Assembly short-circuited the ordinary judicial process and declared by legislative fiat that Grand River Enterprises violated the law and owes damages.

82.    Oregon sued the OPMs, who had the opportunity to exercise their due process right to a hearing before a neutral adjudicator, and instead chose to settle.  Likewise, SPMs voluntarily opted to settle with the State.  Oregon never sued NPMs like Grand River Enterprises, yet now seeks to extract settlement payments from them anyway.  Upholding Oregon's law would imply that the entire settlement process with the OPMs was pointless, as Oregon could have unilaterally imposed the bargained-for terms through legislation.

83.    Were there any doubt as to H.B. 2128's character as an adjudication of smoking-related liability against Grand River Enterprises and other NPMs, it is dispelled by the fact that H.B. 2128 *counts equity assessments against future judgments*.  In other words, if Oregon were to sue Grand River Enterprises for allegedly imposing public-health costs on the State and obtain a judgment for the exact amount Grand River Enterprises had paid to that point in equity assessments, Grand River Enterprises would owe nothing on the judgment.  That is because H.B.

2128 is *itself* the judgment in that hypothetical suit.  That H.B. 2128 eliminates the need for Oregon to bring an actual suit against Grand River Enterprises to effectively obtain a judgment for tobacco-related liability proves that H.B. 2128 is an adjudication of liability for purposes of the Due Process Clause.

84.    H.B. 2128 is also a significant departure from the prior escrow scheme.  The escrow scheme assured an available sum of money from which Oregon could collect if an NPM acted culpably and Oregon asserted claims against it.  NPMs continued to earn interest on their escrow payments and the funds would eventually revert back to the NPMs.  This scheme operated pursuant to the stated legislative policy that NPMs should not escape liability *in the event that they settled claims brought by Oregon or were found culpable by courts*.  H.B. 2128, however, departs radically from this approach, treating PMs as culpable without any settlement or finding by a court.  And instead of merely ensuring that payments are available in the event the State later becomes entitled to them, H.B. 2128 declares the State's entitlement and seizes those payments for the State immediately.

## PRAYER FOR RELIEF

85.    WHEREFORE, Plaintiff Grand River Enterprises respectfully requests that this Court enter judgment in its favor against Defendant and grant the following relief:

A.    A declaration that enforcement of H.B. 2128's equity-assessment scheme, Or. Rev. Stat. §§ 323.804, .806, against Grand River Enterprises would be unlawful under the Commerce Clause of Section 8 of Article I of the U.S. Constitution;

B.    A declaration that enforcement of H.B. 2128's equity-assessment scheme, Or. Rev. Stat. §§ 323.804, .806, against Grand River Enterprises would be unlawful under the Due Process Clause of Section 1 of the Fourteenth Amendment;

C.      A permanent injunction against future enforcement of H.B. 2128's equity-

assessment scheme, Or. Rev. Stat. §§ 323.804, .806, against Grand River

Enterprises;

D.      An award of costs, reasonable attorney's fees, and (if applicable) expert fees

pursuant to 42 U.S.C. § 1988(b) and (c); and

E.      Such other relief that this Court deems just and proper under the circumstances.


Dated:  March 27, 2024                          Respectfully submitted,

                                                HARRANG LONG P.C.

                                                By:  _s/ C. Robert Steringer_____
                                                C. Robert Steringer (OSB #983514)
                                                    bob.steringer@harrang.com
                                                James E. Mountain, Jr. (OSB #752673)
                                                    james.e.mountain@harrang.com
                                                Erica Tatoian (OSB #164896)
                                                    erica.tatoian@harrang.com
                                                HARRANG LONG P.C.
                                                111 SW Columbia St., Suite 950
                                                Portland, OR 97201-5841
                                                (503) 242-0000

                                                David W. DeBruin**
                                                    ddebruin@jenner.com
                                                Adam G. Unikowsky**
                                                    aunikowsky@jenner.com
                                                Leonard R. Powell**
                                                    leonardpowell@jenner.com
                                                Jonathan J. Marshall**
                                                    jmarshall@jenner.com
                                                JENNER & BLOCK LLP
                                                1099 New York Ave., NW, Suite 900
                                                Washington, DC 20001-4412
                                                (202) 639-6000

                                                *Attorneys for Plaintiff Grand River
                                                    Enterprises Six Nations, Ltd.*

                                                ** *pro hac vice* application forthcoming

Complaint — Page 20